I'll call the next case of Don Jones versus Golden Rule Insurance Company. Good morning. We're ready if you are. Good morning. May it please the court, my name is Jennifer Jordan and with Josh Silk, we represent the appellant in this matter, Don Jones. This case involves Golden Rule Insurance Company's failure to provide coverage for appellant's treatment of breast cancer in violation of its obligations under its contract of insurance with appellant. The central issue in this case is whether Golden Rule can use a pre-existing condition exclusion to deny coverage for the treatment of breast cancer where you have no diagnosis of breast cancer or cancer, no symptoms of breast cancer, no treatment or care provided to the appellant for breast cancer, and no medical advice received by the appellant for breast cancer before the effective date of the contract of insurance. But under A, as I read it, it is a condition for which medical advice, diagnosis, care, or treatment was recommended. The operative word condition for which diagnosis was recommended, which I interpret, and I think the defendants do as well, that a diagnostic procedure was recommended to be conducted to clarify what was a suspicious circumstance. Is that not what happened here? Your Honor, what happened here, and specifically with the facts, we had appellant who went for her annual physical examination in the beginning of 2014. At that physical examination, she reported no symptoms whatsoever and none were documented in the medical record. As part of the annual physical examination process, her general practitioner ordered a screening mammogram like all women do over the age of 40. She went and then had that screening mammogram in April of 2014. Thereafter, she received coverage from Golden Rule Insurance Company Health Insurance in June, and I think it was effective June 26th of 2014. On July 14th... After she has a second mammogram that was recommended because of what had happened in the first mammogram, correct? No, Your Honor. No, that's right. You're right. That's right. The first mammogram. Then after that was looked at, then a second mammogram occurred after. Right. She did not receive the recommendation or the report that indicated that she needed to have another mammogram until July 14th of 2014, which was after the effective date of the insurance. Now, the recommendation to have the second mammogram was made, what, wasn't it after the reading of the April mammogram in May by Dr. Bauer? In terms of the recommendation, the report itself indicates that there needed to be a second mammogram. You are correct. But in terms of the actual receipt of that recommendation or even understanding or knowing what that result was, the appellant didn't get that until July 14th, which was after the effective date of the insurance. But she had some notification she needed a second mammogram because she got the mammogram the same day she got the report, didn't she? You have to make an appointment ahead of time. No, in terms of, so what we're talking about here is we've got the screening mammogram that happened in April of 2014. Right. We have insurance. The insurance contract becomes effective on June 26th. On July, we have some other events. We have her leave her job April 30th and decline to enroll in COBRA because it costs too much. And then we have her, Dr. Bauer does a report in May noticing a lot of suspicious things. And then she, June 25th, gets this policy. July 14th, she gets a second mammogram. But the doctor's analysis of this had occurred before she gets that second policy or his concern about the need for another diagnosis. It occurs. The reading of the film occurs before the effective date. But actually understanding, having any knowledge or any awareness of exactly what that result was, the appellant did not have that and neither did her general practitioner. It is undisputed data. So why did she get a second mammogram July 14th then? She got a second mammogram on July 14th because that's when she actually got the results or got the recommendation for the second mammogram. I thought she actually had the mammogram that same day. She did because she didn't. So the second she gets the report in the mail, she drives over and gets a second mammogram? Actually, she didn't get the report in the mail. She was present at the doctor's office, demanded to get the report. They handed it to her, and she said, Look, y'all, y'all haven't gotten this to me. Y'all need to get me in and get this done ASAP, which they did that day. So the day that she actually got the report and got the recommendation for the second mammogram, she actually had it done that day. Isn't the key here what the word diagnosis means in A, does it mean diagnostic procedure or does it mean diagnostic conclusion? You're exactly right, Judge Gilman. And in terms of specifically under Georgia law and how we've looked at these cases before, look, diagnosis has never been necessarily defined under Georgia law in one of these insurance cases. However, it's interesting because there is the case of Bergen. I believe it's Bergen v. Time Insurance Company. And why is this important? Because in Bergen there was a clause that was comparable to the one here, except it didn't have the word diagnosis in it. So you think, well, how is it important? Well, it's important because in terms of the facts of that case, you had a situation where there were signs or symptoms of ovarian cancer or some kind of gynecological cancer. The doctor said to the insured prior to the effective date, said you should probably go get an ultrasound or see somebody else about this. She didn't do it. The effective date happens, and then she gets a diagnosis after the fact. Now, diagnosis isn't there, but the court there said that it was proper for the insurance company to deny coverage because of the advice she received. So the whole idea that telling someone or there being a recommendation for a diagnostic procedure actually means the word diagnosis, when you have Georgia law that indicates when there has been a recommendation for a diagnostic procedure, that that actually falls under the word advice. You basically, if you construe diagnosis to mean diagnostic procedure or recommendation for diagnostic procedure, you basically render advice superfluous. It's just extra. They can mean the same things. If, in fact, what we're talking about is the receipt of some advice to get another procedure, it can fall under advice. The problem here in why this was such a forced reading of the language and why we use the word diagnosis to mean a recommendation for a diagnostic procedure is because the facts show she had no clue. She was not given a recommendation. She was not told what the results showed or that there was anything on it. And in terms of it being suspicious, Judge Carnes, specifically, it was inconclusive. They did not get a good read. And so BYRAD 0, that basically means we have to do a redo because we can't see what's going on. And there has been this interpretation or this kind of extra gloss on things to say that somehow because you have an inconclusive mammogram that doesn't say cancer, doesn't say malignancy, doesn't say anything like that and, in fact, uses terminology, medical terminology, to mean that it's inconclusive to somehow equate to cancer. It's just not in line with medicine or with fact. As Judge Gilman was saying, though, the diagnosis, a diagnostic procedure was recommended, you would agree, within the last 60 months before her policy began, correct? It was recommended in May that she have a diagnostic procedure. I would, Judge Carnes, with respect to that, the report itself says there should be a redo, right? That's what the report says. But you can't have a recommendation in a vacuum. And also you can't force, you know, recommendation for diagnostic procedure when under the actual language of the exclusion policy, you have the word, the receipt of advice. And under all of the cases, all of the cases, what was important in Lococo in terms of when you sat on that panel, Judge Gilman, or any of the other cases, at the end of the day, what we're talking about is either objective awareness of a condition, right, for which objective knowledge. Or in Lococo, what we were doing is we were looking at Ohio law to basically say, look, even if you don't have an objective diagnosis, if there are subjective symptoms that would lead a reasonable person there, then it's okay to deny coverage under this. Here, we don't have any of that. We absolutely don't have any of that. We have no knowledge. We have no symptomology. We have nothing except someone who has no idea that anything is wrong with them. They enter into an insurance contract and thereafter are told, well, maybe you need to get your mammogram redone. And then when they do that, it ends up turning into a diagnosis of cancer. I mean, you could even take it back a step further. I mean, every woman over 40 is supposed to get an annual screening. Absolutely. I mean, is that a diagnosis that turns into a preexisting condition if you're diagnosed with cancer? Well, the question is, again, is it whether a woman goes in, you get a mammogram result and says, hmm, not so sure about this, better go have the 3D or go have another one. At that point, the woman says, hmm, better get health insurance. And your argument would be at that point you don't have a diagnosis of cancer, so it's okay to get the health insurance and cover it. But according to the defendant's reading of this, for which diagnosis is recommended means that if you're recommended, they've seen something, it's recommended you get a diagnosis, you go have a procedure. And if it turns out the diagnosis is related to that condition for which the recommendation of the procedure was made, then the defendant's argument is it's preexisting, correct? And you disagree with that. I disagree in terms of what you say the appellant's argument is. Basically what we're saying is if she would have received that recommendation to get a second mammogram, that would have been receipt of medical advice under the thing. Now, do I dispute whether or not... So is your big point then the fact that even though the recommendation for a diagnosis was made in May, that she didn't get the recommendation until later, is that your argument? Well, that's one of them. I would argue that there is no competent evidence in the record or no medical evidence to say that even that result, that was inconclusive. It was absolutely inconclusive. It said, I can't see anything, right? That is what the doctor says. I can't see anything. She needs to come in. We need to get a redo on this. I don't think that that is for cancer, that that is a recommendation for a diagnosis of cancer. But even if it were, right, even if we were to say that on its face, the fact that she did not receive that recommendation, that she did not receive that result or have any idea that it even existed until after the effective date of the insurance, that's the key here. There was no subjective awareness. There was no objective awareness of the condition or the fact that there could be a condition at play here. But does policy require subjective awareness? Well, it does in terms of the subjective awareness prong, which is B2. But in terms of A. You're talking about A. Right. Absolutely. In terms of ambiguity, we think A and B should be read together. But we'll move on. But in terms of A, what A does is it is kind of the objective awareness criteria part of it, right? We know back in law school, that's what we were taught, that for preexisting condition exclusion, there are two ways to look at it. Either you objectively know you have a condition, or you should know. Either you do or you should. And here, we don't meet either of those. And so I'll reserve the rest of my time. And thank you so much. Mr. Kimball. Good morning. My name is Chris Kimball, along with Brooke Graham. We represent Golden Rule. Let me start out by responding to what the panel seem to be most interested in the discourse. And that is, is there a requirement that Ms. Jones be aware that any of the interpretation of the mammogram has occurred? And it's very clear from the way that policy is worded in preexisting exclusion in subparagraph A, that it's not. It says recommended or received. It doesn't say recommended and received. It doesn't say received only. If the appellate is correct, they are taking recommended out. And the court would have to read recommended out of the exclusion in order for them to find it in her favor. Ms. Jones' condition triggered subparagraph A in three of the four ways that it could be triggered. Obviously, you've talked already about diagnosis. But also, her cancer was a condition for which she had also, for which medical advice and care also had been recommended. So, even though the trial court focused on diagnosis, we raised all three of those, and the court can affirm if it has a concern about diagnosis and the proper definition. Wait, wait, wait, wait, just a minute. A, as I look at it, deals with known conditions. B, deals with unknown conditions. Am I basically right on that? You're absolutely right. Okay. And C, deals with pregnancy. And any layperson looking at that would say there's an order to that. A deals with something for which medical attention has been directed. Right. The plaintiff doesn't have to know about that, or this patient doesn't have to be aware of that. No, but it has to be, I mean, particularly if you just look at words that aren't key here, but the care or treatment are two of the four words in A. And if she had been recommended for care or treatment of cancer, clearly she'd be out the window here in this case. That's correct. All right. But those recommendations also constituted medical advice that would trigger the exclusion. Also, the reading of the mammogram itself is care that would have constituted. Not care for cancer. No, sir. Care in the sense of reading the mammogram. If Dr. Bauer, look at it this way. Which she couldn't do. I mean, that's the way I read that. You say care is reading the mammogram. What I understand Dr. Bauer to have said is I can't read the mammogram. Well, all Dr. Bauer said, well, first off, Dr. Bauer read the mammogram. She said there's a line of calcifications. Right, but that doesn't mean you have. Calcification is not equal to cancer, is it? A lot of women have calcification in their breasts, maybe fibrocystic disease, other things that never develop into cancer. That's correct. The significance of hers, though, was that they were in a line. Well, who says that that makes it likely to be cancer? Dr. Du Bois. Who is not licensed in Georgia, right? That's correct, but that's not a requirement for him to give testimony in the case. And his testimony in this case is unchallenged. It's a requirement under B, B-1. That's correct, Your Honor, but we did not move on B. We moved solely on A. And that's the issue that's presented for you, and that's what the district court looked at. But his 40 years of treatment, he is able to testify, having ordered many screening mammograms and many diagnostic mammograms, that they are not one and the same thing. This screening mammogram was not repeated. That is the confusion that the appellant's argument engenders. A different mammogram, a diagnostic mammogram, was performed. And Dr. Du Bois testified, it's obvious from reading the interpretation of Dr. Bauer, she is concerned about the possibility of a malignancy. She says we need to have a diagnostic mammogram with these specific views. She got Dr. Du Bois saying it's clear what Dr. Bauer meant, even though Dr. Bauer didn't say that. Well, Dr. Bauer, all we have from Dr. Bauer is her interpretation. She had been designated as an expert by the appellants. They withdrew her. They chose not to put any testimony in from her. So all we're left with is what Dr. Du Bois testified to regarding his interpretation of the medical records. Let me ask you this. And that's undisputed. If the word diagnosis is ambiguous because it could mean diagnostic procedure or it could mean diagnostic conclusion, then clearly the April mammogram, even as read in May, was not a diagnostic conclusion that the plaintiff had cancer, right? That's correct, Your Honor. But it has to be for you to win. It has to be a recommendation of a diagnostic procedure. That's correct. And the record's clear. You don't diagnose cancer based on a mammogram. Okay. You know, you have to get to confirm it with a biopsy or something else. No doctor is going to say, look at a mammogram and say you've got cancer. All right. But if, in fact, the word diagnosis could mean diagnostic conclusion, then you're out the window, right? If that's all it means, yes, because we don't have a diagnostic conclusion. But if it's ambiguous, you also lose, right? Because if there's any ambiguity in this contract, it's construed against golden rule who drafted it. Not necessarily. If a word can have two different meanings, like the court found in the LoCocco case, it can mean both. In this particular case, a recommended diagnosis makes no sense, just like it made no sense in LoCocco. So the only reasonable interpretation of that is that it's a recommendation that she go get a diagnosis made. Well, you know, let's concentrate on the word advice, which is one of those four words. To say recommended, the recommend advice makes no sense either, does it? Well, the advice was the recommendation. Because advice itself is a recommendation. That's true. That's exactly right. So the word recommend may not mean the same thing as, you know, only it could mean, and the plaintiff says it could mean to mention or introduce as being worthy of acceptance. But that's not an ambiguity in the contract. That's an inconsistency or an ambiguity perhaps in the facts and how you apply them. But that doesn't make the contract itself ambiguous. Well, let me ask you this. If golden rule had wanted to exclude coverage for diagnostic procedures, you know, as a condition that occurred within the last five years, it could have said so explicitly, couldn't it? I think they did say so explicitly. No, no, because there are cases that I've found that, in other cases, where the language of the policy includes diagnostic procedures. Yes, sir. And where you have, and those arise out of similar cases to the ones that plaintiffs rely on in this case. The Ross case, Bergen, I'm sorry, Ross and others that we cited where, and the LoCocco court dealt with all of those because the preexisting condition exclusion was different. It said, all of them said that treatment must be received. We don't travel on treatment here. The reason those courts went off in the direction that they did is because treatment necessarily intimates a diagnosis has been made. And because those preexisting condition exclusions did not specify whether a diagnosis was required, they were found to be ambiguous in those cases. We don't have that situation here. Otherwise, the exclusion in LoCocco in material part is identical. Well, no, no, wait a minute. I've been accused of being on the LoCocco court. Is that true? Well, your name's on it. You were on it. You didn't write it. It must be true. It was ghostwritten probably. You didn't write it, but they're giving you credit for being involved. All right. Well, as I recall, though, in that case, that was a case of a mass in his lung, right? The x-ray revealed a cloud. He was referred to a doctor. There were very strong indications of lung cancer. He was sent to a pulmonologist who specialized in lung cancer, and all that was before the policy became effective. So isn't that case fairly distinguishable from what we've got here? There was no designation of it. There was no mass seen. There was no recommendation that you go to an oncologist. I mean, there was no cloud, you know. I think the difference, and it's not a distinction that makes a difference in that case, is there was more attention devoted to his condition before the policy became effective than in this case. Also, he was aware of the attention that had been devoted to it. Right. There was a lot of suspicion. That's correct. But where is the suspicion here based on the April mammogram? It's in Dr. Bower's mammogram. It's in the fact that she says further studies need to be done. Well, she says inconclusive. Right. She needs a more detailed mammogram. That's correct. But she doesn't say, I can't see anything here. Repeat this screening mammogram. That's not what happened. Dr. Bower saw enough, a line of calcifications that are significant because they can follow a duct and indicate the presence of cancer. She said more detailed examination. Not a repeat. More detailed examination of these areas need to be done. And perhaps an ultrasound as well. And that's significant because that is diagnostic. What is the evidence in the record that the mass in the second mammogram is the same as the linear calcifications in the first mammogram? Where does that evidence come from? Dr. DuBois testified to that in his deposition. He was able, he looked at the map. Anywhere else? Anywhere else? No, ma'am. It's in the record itself. And he was able to, and because of the... Well, no, I mean, the records, no. I mean, the records don't say this mass equals the linear calcifications in the earlier mammogram. It takes somebody to... No, that's correct. Somebody looking at them. What they do say, though, in the operative report, they specify exactly where the cancer was located. It's also in the pathology report. And the pathology report identified the linear calcifications that were on the mammogram. So Dr. DuBois is the one that put together and proffered the medical opinion, which is uncontroverted, and the plaintiffs haven't ever disputed this, that the cancer that showed up on the mammogram, the original screening mammogram, was the cancer that ultimately was removed. And that's undisputed. You're saying the original screening mammogram showed cancer? No, ma'am. The calcifications. The calcifications turned out to be cancer. They were within the cancer, though. Well, based on the testimony of Dr. DuBois. That's correct. But also the testimony of the treating physicians who said, I removed cancer. So this is going to boil down to whether we think that under A, whether the diagnosis of cancer was a known condition at the time. And that's the question. Because if diagnosis is interpreted to mean a diagnostic conclusion, you don't have a conclusion with that mammogram that she had cancer. That didn't come until after the policy became effective. Now, if we say diagnosis means just a diagnostic procedure, then you're probably okay. Well, and that's what the dictionary definition says. It can be either one. I read it. You can define diagnosis as either a diagnostic procedure or a diagnostic conclusion. And if you have two different interpretations of what the word diagnosis means, you're going to lose, aren't you? No, Your Honor, because it makes no sense. You have to construe it the way an ordinary layperson would under Georgia law. And that doesn't mean splitting hairs. It means what would a layperson see if they saw that? And what they would understand is that if you have been recommended to go get a diagnosis, that's preexisting. The idea behind the policy is to exclude conditions that existed, whether you knew it or not. Right, but mostly it's clear if care and treatment are pretty clear. If she had had any care or treatment for cancer, you know, before the policy became effective, clearly she's out the window. I don't know that the policy requires care and treatment for the cancer. It requires care and treatment for the condition. I'll go that far, and I agree with that. Well, but the condition we're talking about is breast cancer. The condition we were talking about at the time the mammogram was taken was a line of calcifications that later was diagnosed as breast cancer. That diagnosis doesn't have to exist for any of the four to exist. If the calcification had proved benign, that wouldn't be the condition for which we're talking about coverage under the policy, is it? Well, it would be because whatever the condition proved to be is what it is. But the point is the mammogram... But you don't typically get treated for just calcification. No, Your Honor, but you will have diagnostic tests devoted to that to determine whether it's cancer or not. And it's the condition, whatever it happens to be, if it turns out to be fibrocystic disease, if it happens to be scar tissue from some unrelated infection, or if it happens to be cancer, which is the first thing that Dr. DuBois testified you think of, whatever it is, that was the condition. But you don't get treated for fibrocystic disease. You don't get treated for calcification. You get treated only if it's cancer. That's true, and if all we were talking about is treatment, you'd be right. But the evaluation that you go through to determine whether it's cancer or fibrocystic disease, that's certainly care. If it's not done right, an action can be maintained for a brief... Well, what do you think is your strongest case analogous to this situation that supports your position? In state courts, Bergen. In the Bergen case in Georgia, and then Lococo. Because, as the district court found, that was squarely on point. And it also admitted, because there are... It's very clear, and you can put aside the medical advice. I understand your concern about that. You can't really get around care. You can't really get around diagnosis. Either one of those is sufficient to trigger the conclusion, one way or the other, that it's preexisting. And it's subparagraph A. If you have any more questions, I'm glad to answer them. Thank you. Thank you. Ms. Jordan, opposing counsel talked about Bergen. If you could help me a bit more with that case, my notes indicate that in Bergen's Georgia case, the doctor, during the look-back period, found a large pelvic mass in the patient, and he recommended she undergo an exploratory procedure. It wasn't diagnosed as to ovarian cancer, though, until after she had gotten her policy, apparently. And the Georgia court said, in a policy, said, an illness or injury for which medical care, treatment, medicine, or advice was received during the look-back period. How do you distinguish that? Your opposing counsel says that is his best case. Your Honor, I think it's one of our better cases, too. Specifically because, in terms of the recommendation made by... Because that one required the patient to receive the advice. Exactly. So what you have is you have a recommendation by a physician for a patient to go get a diagnostic procedure or to see a specialist because he thinks something is wrong. And there, what they did is they construed the receipt of advice to be where that falls under whenever there's a recommendation for a diagnostic procedure. And so here, in light of that, where we have that language, advice, and specifically... Well, he didn't let me anticipate. He can't stand up again. But I think what the next question I would have in that, this policy, though, doesn't require received. It says was recommended or received. So the argument then would be diagnosis or advice was recommended. And the theory, in a sense, I guess, opposing counsel's honor is that Bergen then, in that case, if you add the extra word recommended, that Bergen would apply. Your Honor, with respect to that, we read these the way we would normally read anything, right, when we look at these. And so the way we read these is that you have recommend or received, right? But with advice, you can't get advice recommended. So the whole point is that, with respect to the word, whether it's advice, diagnosis, care, or treatment, you use the appropriate modifier. Whether that is recommended or received. But can't you have a recommendation of a diagnosis? I recommend diagnosis. That is an answer. For example, a doctor would say to you if cancer is being suspected, I recommend that you have a diagnosis whether there's cancer. The doctor wouldn't say, I recommend a diagnosis of cancer. You don't recommend the result. You can only recommend the procedure, correct? That is correct. But that's why the procedure or the recommendation for a procedure would fall under advice. Diagnosis is the fact of a certain condition, correct? And so what Judge Gilman was saying is that there are two different ways we can look at this. You can look at it as a diagnosis in that you have cancer, or you can go further, which is what the district court did, and say, well, we recommend that you get a diagnostic procedure. Now, is that a reasonable way to look at it? Sure. Is that the way I read it? No. But the fact of two different interpretations here, that means that it's ambiguous. And when you have an ambiguity, you have to construe it in favor of the insured and in favor of coverage. And so that's why, you know, if you read it just like it is, a diagnosis that's received, there you go. That is not what happened here. And so A is, you know, we don't come under A at all. Recommended, you would say then, to make that word still have some use, you would tie recommended only to other nouns. You would tie that to treatment, I guess, or care. I would say a condition for which medical advice was received, a condition for which a diagnosis was received, a condition for which care was recommended or received, or a condition for which treatment was recommended or received. It's how you would normally read this in any other context. And just because it's an exclusion, you don't do otherwise. And when you look at the word diagnosis, yeah, you can go to the dictionary and come up with three or four different ways that you can say what diagnosis may mean. But the ordinary reading of this, or the way I read it initially, was that you actually have to have some kind of diagnostic result. And it makes sense here, because if you're talking about the recommendation for a diagnostic procedure, we know per Bergen that that would fall under the advice prong of this exclusion specifically, because that's the way we've looked at it under Georgia law. I gather that sometimes these prior cases, I guess if she had had some, if the doctor, if Dr. Bauer had some suspicion that she had voiced in her report that you have cancer, and I won't know until you have a biopsy and check it out, you'd have a problem. I gather your position is, though, that there was no suspicion, based on the April mammogram, only that we needed a further diagnostic procedure to see if she had cancer. Right. I mean, it was... What's your position, though, about the calcium... The calcifications? Well, even Dr. DuBose is not qualified under the contract, and I dare say under any analysis, he would not be qualified to offer expert testimony with respect to this. You didn't have it excluded under Dalbert, did you? No, because this is a breach of contract issue in terms of whether or not they met what they were supposed to do under the contract, and they specifically defined qualified doctor under the contract as someone who is licensed in this state. That's basically what we were going with. In terms of the calcifications, if you look at his testimony, he says he doesn't know the BIRAD systems. The calcification is something he would have to leave for a radiologist to interpret. He said that he didn't read the imaging. He didn't even know later on what pleomorphic is. In terms of the calcifications themselves, he says calcifications are not cancer. Calcifications are calcium deposits. That's it. That's all it is. So the whole idea that this lesion they find or this mass that they find months later somehow equals the calcifications, that's just not true. And there is no medical evidence to that effect, whether it's from Dr. DuBose, who is not qualified here or otherwise, or just on the face itself of the mammogram report that we're talking about that was first issued by Dr. Bauer. And calcifications can be present on a mammogram when you have fibrous breasts for any number of reasons, which is why you usually then go to the next step and say, okay, why is this here? Am I seeing everything or am I not? I mean, it's just good medicine to go to the next step. It doesn't mean that Dr. Bauer said, ha, look at those calcifications, that's breast cancer. If she really thought that, do you think there would be a delay in months of even getting the information to a palate that she needed to do a redo of a mammogram? I mean, that just kind of belies common sense. And so what we have is we have an inconclusive mammogram that shows calcifications, which could mean something or nothing, and what we do know is that they don't equal cancer. So even if we're talking about, in terms of Golden Rule's counsel, he conceded that the condition they're talking about on the mammogram is the calcifications. The calcifications are not cancer. So if you go back to the condition, the pre-existing condition that was the basis for the exclusion, that even there, the calcifications aren't cancer. What they're trying to do, or what they did, is deny coverage for the treatment of cancer. It wasn't deny treatment for the coverage of calcifications. That's not what is at issue here. Now, if she had received that report earlier, or if someone had told her that she needed to go get a redo earlier, before the effective date of the cancer, we wouldn't be here. I mean, we just wouldn't be. So the idea that we have someone... Why wouldn't you be? Because I dare say that if she would have received that, she would have gotten a redo, and she probably would have stayed at her job at King & Spalding. I mean, it's one of those things that that's why we do what we do. She was acting with the information she had. That is the fascinating thing about this case to me, and it's not in the record, but this is a very cheap policy. $168 a month. You can't find one that cheap. And obviously, that means that the insurer has to have a pretty stiff preexisting clause. It's not an Affordable Care Act where you can walk in. She could have still gotten COBRA even, I think it's within 60 days, why she didn't go back when she gets this result and just say, I want my COBRA. And her testimony had been she didn't want COBRA because it cost too much. Your last point doesn't make any sense to me, that she would have gone back and gotten insurance with COBRA. Well, either she just would have acted differently. I mean, because we act based on the information we have. But that's not an issue in this case. An issue is exactly what happened and how it happened and what the language says or doesn't say. Here we have ambiguous language. I just want to get your position. So if somebody, the nurse said to her or the doctor said to her, said, I recommend, I see something here that could be nothing, could be something. And I recommend that you go get another mammogram. If she had heard those words, same facts we've got here, somebody just told her that, you're saying then that the insurance company be correct, the preexisting condition would apply. It would be a different case. I'm not saying exactly. You said we wouldn't be here, which suggests that you. Well, what I believe is that she would have gotten treatment and probably would never have gotten the short-term policy in the first place. I thought you were saying that would mean that she'd know that she had had a diagnostic procedure recommended. She had heard that recommendation, meaning that you would then conclude diagnosis could include diagnostic procedure. Now, if she would have heard that I recommend you go get a diagnostic procedure because I think that this is suspicious for cancer, then yeah, or suspicious for a malignancy, then absolutely under the policy in and of itself. In terms of I don't think we would be here, I just don't think she would have had a short-term health insurance policy, and I don't think we would have been dealing with the denial of coverage here in terms of her cancer treatment. And you would say that's, but you then stretch the word diagnosis to diagnostic procedure in that context then. No, it would come under advice actually. It would come under the receipt of advice before the effective date, and that would squarely fall under burden. And so that's what we're talking about here. All of the cases, Lococo, Pitcher, all of them, all deal with some kind of awareness of the condition for which coverage is denied. Some kind of awareness, either subjective, well, you had a lump in your breast, or you had a headache, or you had a cough, or objective. You were told that you had cancer or you had signs of cancer. Ergo, it's preexisting. Here, it is undisputed. There is no subjective awareness at all. Undisputed by Golden Rule. And undisputed that objectively we have no awareness of this. And because of that, it is a case of first impression in the sense that we're saying that someone who had no idea that anything was going on is now not going to be able to get coverage under a preexisting condition exclusion that really requires some kind of awareness, whether objective or subjective, per what the Golden Rule counsel said earlier in his argument. I'm happy to take any other questions. Thank you very much. Thank you. Appreciate the presentation.